UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSHUA CANGIALOSI,

      Plaintiff,                            Civil Action No. 13-10210

v.                                 HON. TERRENCE G. BERG
                                      U.S. District Judge
                                      HON. R. STEVEN WHALEN

COMMISSIONER OF SOCIAL       U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Joshua Cangialosi ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying his application for Supplement Security Income ("SSI") under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

Plaintiff filed an application for SSI on May 6, 2009, alleging disability as of May 1, 2006 (Tr. 195-197). After the initial denial of the claim, he filed a request for an administrative hearing, originally held on March 28, 2011 in Toledo, Ohio before

−1−

Administrative Law Judge ("ALJ") Melissa Warner (Tr. 92-100). The hearing was adjourned for further development of the record (Tr. 99). ALJ Warner presided at the second hearing, held July 21, 2011 (Tr. 61). Plaintiff, represented by attorney Chad Simpson, testified (Tr. 65-84), as did vocational expert ("VE") Joseph Thompson (Tr. 84-90). On August 20, 2011, ALJ Warner determined that Plaintiff was not disabled (Tr. 52-54). On November 20, 2012, the Appeals Council denied review (Tr. 1-6). Plaintiff filed for judicial review of the Commissioner's decision on January 17, 2013.

## BACKGROUND FACTS

Plaintiff, born March 27, 1980, was 31 at the time of the administrative decision (Tr. 54, 195). He completed 10th grade (Tr. 243) and worked previously as a cashier, car detailer, concession stand worker, and cook (Tr. 235). His application for SSI alleges disability as a result of hepatitis C, a closed head injury, open heart surgery, a pacemaker, bipolar disorder, and the removal of his spleen (Tr. 235).

### A.     Plaintiff's Testimony

Plaintiff offered the following testimony:

He currently lived with his wife and teenaged stepchildren (Tr. 65). He left school after 10th grade but actually did not receive more than a seventh or eighth grade education (Tr. 66). He did not experience problems reading, writing or performing calculations (Tr. 66). Between 1996 and 2003, he worked full time as a cook at his brother's restaurant (Tr. 67). He admitted that his brother paid his salary in cash (Tr. 68). The job required him to lift up to 20 pounds (Tr. 68). He attempted to resume working for his brother in 2007 and

2008 on a part-time basis but was terminated for performance issues that were attributable to bipolar disorder and disputes with his former wife (Tr. 69).

Plaintiff was unable to work due to bipolar disorder and chest, knee, and back problems (Tr. 70). He previously (2004) underwent open heart surgery resulting in shortness of breath, heart pains upon exertion, and dizziness (Tr. 71). He experienced five-minute dizzy spells approximately four times a week (Tr. 72). He experienced knee pain since shattering his knee cap in an automobile accident (Tr. 72). He was refused knee surgery based on his history of polysubstance abuse (Tr. 73). Plaintiff had not "shot up" in three years, but took pain medication, "as prescribed" for knee pain (Tr. 73). As a result of a second car accident, he experienced muscle spasms of the back (Tr. 74).

As a result of bipolar disorder, Plaintiff was sometimes unable to finish sentences (Tr. 74). He was "hyper" at certain times and depressed at others (Tr. 74). Concentrational problems, dizziness, anxiety, and knee problems prevented him from working (Tr. 75). He took Xanax for anxiety attacks (Tr. 75-76). He had experienced anxiety for the past seven years (Tr. 76). He also took Suboxone, Prozac, and Norco (Tr. 77). Xanax created the side effect of drowsiness, but was not effective in controlling psychological symptoms (Tr. 77). He had not used alcohol in at least eight years (Tr. 78).

He recently completed a substance abuse program sponsored by the Salvation Army (Tr. 78). Before attending the substance abuse program, he was convicted of selling OxyContin and sentenced to approximately 45 days of jail time (Tr. 78). The substance abuse program was beneficial (Tr. 78). Plaintiff was currently in therapy (Tr. 78).

–3–

Plaintiff experienced discomfort after sitting for extended periods (Tr. 79).   He coped with pain by lying down approximately three times a day (Tr. 79).   He experienced sleep disturbances due to nightmares (Tr. 79).   On a typical day, he would watch television, go to church or attend a Bible study, perform light household chores, and grocery shop with his wife (Tr. 80).   However, he was unable to carry two grocery bags without becoming short of breath (Tr. 80).   He was able to attend to his personal needs (Tr. 81).   He smoked "four or five" cigarettes a day (Tr. 81).   He was unable to walk for more than 15 minutes, stand for 60, or sit for 45 (Tr. 81).   He was able to perform fine manipulations (Tr. 82).   He disliked being around other people (Tr. 82-83).

**B.   Medical Evidence**[1]

**1.   Treating Sources**

In April, 2001, Plaintiff sought emergency treatment after sustaining injuries in a car accident (Tr. 286-287).   Imaging studies show a fractured left patella and a pancreatic injury (Tr. 287, 299).   He received a knee brace (Tr. 290).   Treating records state that Plaintiff's mother advised medical personnel that Plaintiff had been taking 20 Vicodin every day since a 1997 car accident and was scheduled to enter a substance abuse program (Tr. 295).

---

[1]Medical records predating the alleged onset date of May 1, 2006 are included for background purposes only.   Evidence unrelated to Plaintiff's argument for remand, reviewed in full, are mostly omitted from the present discussion.

August, 2001 imaging studies of the left knee showed good alignment (Tr. 695).   In February, 2002 emergency room personnel denied Plaintiff's request for narcotics to control back and knee pain (Tr. 982).

March, 2004 emergency room records note a history of drug abuse (Tr. 970). Plaintiff noted that he dropped out of school in 10th grade but later obtained a GED (Tr. 971).   In December, 2004, Plaintiff underwent cardiac surgery for a valve replacement and implantation of a pacemaker (Tr. 308, 316-320, 408-409, 423-428).   Upon admission, an MRI showed evidence of a hemorrhage (Tr. 497).   Treating notes created after the aortic valve replacement state that Plaintiff denied chest pain, lightheadedness, dizziness, or shortness of breath (Tr. 302). Imaging studies taken following the surgery showed good results (Tr. 352).   Inpatient occupation therapy records following surgery state that Plaintiff was resolved to stop all drug use (Tr. 665).

In January, 2005, Plaintiff underwent a laparoscopic splenectomy after imaging studies showed "multiple abscesses in the spleen" (Tr. 300, 351, 360).   Surgery records note that Plaintiff was an intravenous drug user (Tr. 300).   The splenectomy was performed without complications (Tr. 300-301, 342).   Treating notes from the following month state that Plaintiff was making "excellent progress" (Tr. 305).   An incision at the site of the pacemaker was "well-healed" (Tr. 302).   Michael G. Moront, M.D. remarked that Plaintiff was "weaning off" methadone therapy and was planning to enter a drug rehabilitation program (Tr. 305).   Treating records from the same month state that Plaintiff had a warrant out for his arrest after failing to pay child support and requested an

opinion letter stating that his medical condition would prevent him from being jailed (Tr. 324). March, 2005 laboratory results indicate that Plaintiff contracted a staph infection (Tr. 598).

In March, 2006, Plaintiff sought emergency treatment for back pain (Tr. 672-673). He was prescribed Acetaminophen (Tr. 673). Treating notes state that Plaintiff smoked (Tr. 674). In July, 2006, Plaintiff sought emergency treatment for chest pain (Tr. 332). Imaging studies were negative for pathology (Tr. 332). He was discharged with a diagnosis of "pleuritic chest pain" (Tr. 333, 336). Notes from a September, 2006 cardiology checkup were unremarkable (Tr. 710). Plaintiff denied tightness or heaviness with only "on and off" chest pain (Tr. 710). In December, 2006, Plaintiff sought treatment for upper back pain (Tr. 675). He was prescribed Vicodin (Tr. 675). A January, 2007 chest x-ray was negative for abnormalities (Tr. 676). In April, 2007, Plaintiff again sought emergency treatment for chest pain (Tr. 919).

In November, 2007, Plaintiff sought treatment for knee and low back pain (Tr. 690). Treating notes state that Plaintiff requested Vicodin, noting that his work "require[d] being [on] his feet [and] considerable physical exertion" (Tr. 690). The treating notes indicate that Plaintiff needed to continue work to maintain child support payments (Tr. 690). Treating notes state that while Plaintiff complained of ongoing knee pain requiring the use of narcotic pain medication, he "walked out of [the] office carrying [the] crutches and knee brace" (Tr. 1075). Treating notes from the following month state that Plaintiff walked with a limp "favoring the left side" (Tr. 688). The same notes state that Plaintiff

continued to work, but experienced anxiety (Tr. 688).   March, 2008 treating notes state Plaintiff was declined the use of narcotics after exhibiting drug-seeking behavior (Tr. 684). May, 2008 imaging studies of the lumbar spine show decreased lumbar lordosis but no other significant abnormalities (Tr. 699).   Cardiology follow-up notes from the following month indicate no "pain, tightness or heaviness" but occasional dizziness (Tr. 709).   In June, 2008, he presented for emergency treatment after appearing unresponsive (Tr. 847). A drug screen was positive for opiate use (Tr. 847).   In July, 2008, Plaintiff sought emergency treatment for back pain, receiving a prescription for Vicodin (Tr. 785, 823).   In August, 2008 James M. Doyle, D.O. composed a discharge letter, stating that he was withdrawing as Plaintiff's primary care provider (Tr. 772).   The following month, Plaintiff sought emergency treatment for a left foot injury (Tr. 779).   Imaging studies of the foot were unremarkable (Tr. 779).   Emergency personnel noted "suspected narcotic use" (Tr. 778).   Emergency room records from the same month state that Plaintiff admitted to injecting Oxycontin (Tr. 817).

April, 2009 emergency room records state that Plaintiff was denied narcotics for alleged chest pain, noting that Plaintiff had also sought narcotics the previous week (Tr. 805, 811, 813).   Treating records state that he was "in no distress" but was "manipulative and constantly asking for more pain medicine" (Tr. 806).   A chest x-ray was negative for abnormalities (Tr. 806).   In June, 2009, C.J. Strausbaugh, P.A. noted that Plaintiff's chief complaints were substance abuse and anxiety (Tr. 1161).   An August, 2009 psychological intake exam by Catholic Charities of Monroe County, noting a history of opiate

dependency, assigned Plaintiff a GAF of 65[2] (Tr. 1058).  The same month, Strausbaugh opined that Plaintiff was unable to work due to bipolar disorder and coronary artery disease (Tr. 1076).  October, 2009 Catholic Charities records state that Plaintiff's attendance record had been satisfactory (Tr. 1126, 1169).  The following month, Plaintiff sought emergency treatment for knee pain, requesting Dilaudid (Tr. 1182).  An EEG study from the following month showed normal brain activity (Tr. 1184).  January, 2010 emergency room records state that Plaintiff "persistently negotiat[ed] to get Dilaudid for pain . . ." (Tr. 1187).

February, 2010 treating notes state that knee surgery was postponed due to elevated liver enzymes (Tr. 1139).   Notes from the same month state that Plaintiff attempted to procure Vicodin (Tr. 1141).

In June, 2010, neurologist Ram S. Garg, M.D. noted complaints of knee, leg, and back pain, but no weakness (Tr. 1228).  Dr. Garg's records from the same month note that Plaintiff was traveling to Florida (Tr. 1229).  In October, 2010, Plaintiff completed a "relapse prevention program" sponsored by the Salvation Army (Tr. 1220).  In December, 2010, Strausbaugh opined that Plaintiff was disabled independent of his drug use (Tr. 1122).  The physician's assistant noted that Plaintiff had not been seen since July, 2010 (Tr. 1122).

---

[2]GAF scores in the range of 61–70 indicate "some mild [psychological] symptoms or some difficulty in social, occupational, or school functioning." *Diagnostic and Statistical Manual of Mental Disorders--Text Revision,* 32 ("*DSM-IV-TR*")(4th ed.2000).

An April, 2011 chest x-ray was negative (Tr. 1213).   February and March, 2011 records by Dr. Garg advised back exercises and avoidance of heavy lifting (Tr. 1267, 1270).   Dr. Garg's April, 2011 treating notes state that although Plaintiff reported knee pain, it did "not limit activities" (Tr. 1262).   Plaintiff reported that back pain "moderately limited his activities (Tr. 1262).   Plaintiff denied fatigue (Tr. 1262).   Dr. Garg observed that Plaintiff denied "depression, anxiety, [or] panic attacks" (Tr. 1263). Plaintiff appeared fully oriented (Tr. 1263).   Dr. Garg advised Plaintiff to avoid heavy lifting and to keep leg elevated during the day (Tr. 1264).   Dr. Garg's July, 2011 records state that Plaintiff continued to experience severe knee and back pain (Tr. 1251). He advised Plaintiff to exercise and avoid heavy lifting (Tr. 1256).

The same month, Dr. Garg completed a medical questionnaire, finding that Plaintiff experienced radiculopathy with a poor prognosis (Tr. 1276).   Dr. Garg noted no side effects from current medication (Tr. 1277).   He advised back exercises and rest (Tr. 1277). He found that Plaintiff could sit for four hours in an eight-hour work day and stand/walk for two (Tr. 1279).   He noted that Plaintiff required a job where he would be allowed to change positions (Tr. 1279).   He found that Plaintiff could lift 20 pounds occasionally and 10 frequently, but imposed limitations in reaching, handling, fingering, bending, pushing, and pulling (Tr. 1280).   He found that Plaintiff was capable of work "with breaks" but was limited to "low stress work" (Tr. 1281).   He opined that Plaintiff would require a 15 to 20-minute break every two hours (Tr. 1281).   He opined that Plaintiff would likely be absent more than three times a month (Tr. 1282).   He reiterated that Plaintiff was unable to

push, pull, kneel, bend, or stoop (Tr. 1282).

## 2. Non-Examining Sources

In June, 2008, Demetrio Nasol, M.D. performed a non-examining Physical Residual Functional Capacity Assessment on behalf of the SSA, finding that Plaintiff could lift 20 pounds frequently and 10 occasionally; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitations (Tr. 702). He found Plaintiff was limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling but did not experience additional physical limitations (Tr. 703-705).

The same month, psychiatrist H. Gummadi, M.D. performed a consultative examination on behalf of the SSA, noting Plaintiff's reports of memory problems since sustaining a head injury in 1996 (Tr. 754). Plaintiff reported abusing pain medication starting in 2002 (Tr. 754). He reported depression as a result of the death of his mother and sister (Tr. 754). He denied the abuse of drugs since undergoing heart surgery in 2004 (Tr. 755). He denied the ability to lift more than 20 pounds (Tr. 755). Dr. Gunnadi observed an "anxious and nervous" affect (Tr. 755). He assigned Plaintiff a GAF of 50[3] with a guarded prognosis (Tr. 756). A Psychiatric Review Technique performed later the same month found "insufficient evidence" of a mental disorder (Tr. 758).

---

[3]A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *DSM–IV–TR* at 34.

In September, 2009, internist Moises Alviar, M.D. performed a consultative examination on behalf of the SSA, noting Plaintiff's reports of a closed head injury, left knee swelling, and bipolar disorder (Tr. 1077).   Due to the closed head injury, Plaintiff reported mood swings and crying spells (Tr. 1077).   He reported that he now experienced problems in both knees due to the left knee fracture (Tr. 1077).   As a result of bipolar disorder, Plaintiff became angry at some times and tearful at others, but denied suicidal ideation (Tr. 1077).   Dr. Alviar noted some puffiness and a slight decrease in range of motion of the left knee (Tr. 1079).   He noted a stable gait (Tr. 1083).   Dr. Alviar concluded that Plaintiff "should be able to work a few hours in an 8-hour work day in either a seated or standing position," noting that the instability of the left knee joint would create limitations in walking (Tr. 1079).

The same month, Gayle Oliver-Brannon, Ph.D. performed a psychological consultative examination and administered Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV") testing, assigning Plaintiff a GAF of 50 due to bipolar, anxiety, and polysubstance abuse disorders with a guarded prognosis (Tr. 1088).   WAIS-IV testing showed intelligence levels in the borderline range (Tr. 1089).

In October, 2009, Zahra Khademian, M.D. performed a non-examining Psychiatric Review Technique, finding the presence of bipolar disorder, anxiety, and a substance abuse disorder (Tr. 1098, 1101, 1103, 1106).   Under the "'B' Criteria," Dr. Khademian found moderate limitation in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 1108).   Dr. Khademian also completed a Mental Residual

Fucntional Capacity Assessment, finding moderate limitations in maintaining attention for extended periods, working within a schedule, completing a workweek without psychologically based interruptions and accepting criticism (Tr. 1094-1095). She concluded that "[c]onsidering the evidence," Plaintiff had "adequate mental ability for sustained simple tasks" (Tr. 1096).

The same month, Freddie Anderson performed a Physical Residual Functional Capacity Assessment, finding that Plaintiff could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for up to six hours in an eight-hour workday; and push and pull without limitation (Tr. 1114). Anderson found that Plaintiff was limited to occasional climbing but could perform all other postural activities on a frequent basis (Tr. 1115). Anderson determined that Plaintiff should avoid heights, machinery, and other hazards (Tr. 1117). He found the allegations of limitation only partially credible (Tr. 1118).

**Records Created Subsequent to the August 20, 2011 Administrative Decision**

In August, 2012, Plaintiff opted for a recommended "generator change procedure" of his pacemaker (Tr. 1286, 1293). Post-surgical records state that the procedure was performed without complications (Tr. 1297). Plaintiff reported that he was currently working as a chef (Tr. 1298-1299). He requested a work release "for several days off work" prior to the procedure and "one day afterward," noting that possible dizziness would prevent him from working "in a kitchen environment" (Tr. 1299).

## C.   Vocational Testimony

VE Joseph Thompson  classified Plaintiff's former job as a cook as semiskilled and exertionally light[4] (Tr. 86).   The ALJ then posed the following hypothetical question to the VE, taking into account Plaintiff's work background:

> [T]his individual can perform all the functions of light work except occasional climbing of stairs; no climbing of ladders; no balancing on one leg; frequent stooping; rare . . . kneeling; occasional crouching and crawling; no exposures to temperature extremes or humidity or hazards; work at an SVP of 1 to 2 where the pace of productivity is not dictated by an external source over which the individual has no control such as an assembly line or conveyer belt; no contact with the general public and occasional contact with coworkers.  Would such a person be able to perform the claimant' past relevant work? (Tr. 87).

The VE testified that the hypothetical limitations would preclude Plaintiff's former job as a cook, but would allow the individual to perform the light, unskilled work of a folder (4,000 positions in the State of Michigan); mail clerk (6,000); and janitor (5,000) (Tr. 87).   He testified that if the above-limited individual were further restricted by the need to work "in either a seated or a standing position," the jobs of mail clerk and janitor would be eliminated but would allow the individual to perform the work of a production   inspector (3,000) and shipping weigher (1,000) (Tr. 88).   He found that the additional limitation of

---

[4]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

"rare contact with coworkers" or, that "reading, writing, and math should not be important" would not change the job numbers (Tr. 88).

### D.    The ALJ's Decision

Citing the medical records, the ALJ found that Plaintiff experienced the severe impairments of "major depressive disorder/bipolar disorder; and a history of a left patellar fracture," but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 38, 41).   She determined that Plaintiff retained the Residual Functional Capacity ("RFC") for exertionally light work within the following parameters:

> [W]ork that can be performed in either a seated or standing position; never climb ladders or balance on one leg; rare (defined as less than occasional but not completely precluded) kneeling; occasionally climb stairs, crouch and crawl; frequently stoop; no exposure to temperature extremes or humidity, or work around hazards; work with an SVP of 1 or 2: no interaction with the general public; occasional interaction with coworkers; and no work where the pace of productivity is dictated by an external source over which he has no control, such as an assembly line or conveyor belt (Tr. 43).

Citing the VE's testimony, the ALJ concluded that while Plaintiff was unable to perform his past relevant work as a cook, he could perform the work of a folder, production inspector, and shipping weigher (Tr. 53).

The ALJ discounted Plaintiff's alleged degree of impairment, noting that he continued to smoke despite shortness of breath (Tr. 48).   She noted that "the extensive evidence of an addiction to pain medications makes it difficult to determine to what extent the claimant's treatment visits were prompted by symptoms of his impairments, as opposed

to attempts to obtain narcotics" (Tr. 48). She noted that the treatment for knee pain had been conservative and that Plaintiff's alleged psychological conditions had been treated only with medications (Tr. 48).

The ALJ accorded "great weight" to Dr. Garg's opinion of Plaintiff's exertional abilities (Tr. 49).   Nonetheless, she discounted Dr. Garg's April, 2011 finding that Plaintiff needed to keep his leg elevated during the day, noting that it appeared to be a temporary restriction (Tr. 49).  She also rejected the portion of Dr. Garg's July, 2011 assessment stating that Plaintiff would be required to miss more than three days of work each month, finding that the restriction was "purely speculative" (Tr. 49).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.   42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir.   1985).   Substantial evidence is more than a scintilla but less than a preponderance.   It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*   800 F.2d 535, 545 (6th Cir.   1986)(en banc).   In determining whether the

evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.   The Treating Physician Analysis

Plaintiff argues first that the ALJ erred by adopting some portions of treating physician Dr. Garg's   July, 2011 assessment but rejecting others.   *Plaintiff's Brief,* 8-11, *Docket #11-3.*   He makes the same criticism of the ALJ's analysis of Dr. Aviar's September, 2009 consultative opinion.   *Id.* at 12-13.

An opinion of limitation or disability by a treating source is entitled to deference. "[I]f the opinion of the claimant's treating physician is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue, 573* F. 3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004). Further,

> [i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion.
> *Wilson,* at 544 (citing 20 C.F.R. 404.1527(c)(2-6)).

The failure to provide "good reasons" for rejecting a treating physician's opinion constitutes reversible error. *Gayheart v. Commisioner of Social Security,* 710 F. 3d 365, 376 (6th Cir. 2013)(citing *Wilson,* at 544-446). "[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good reasons in our notice of determination or

decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue* 661 F.3d 931, 937 (6th Cir.2011); § 404.1527(c)(2).   "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart,* at 376 (citing SSR 96-2p, 1996 WL 374188, *5 (1996)).

Plaintiff's argument that the ALJ erred by declining to adopt all of Dr. Garg's findings is not well taken.   In the presence of contradicting substantial evidence, an ALJ may reject all or a portion of the treating source's findings. *Warner v. Commissioner of Social Sec.,* 375 F.3d 387, 391-392 (6th Cir.2004). The ALJ found that Dr. Garg's opinion was entitled to "significant weight" with the exception of a few findings (Tr. 50).   First, she noted that Dr. Garg's finding that Plaintiff was unable to walk for more than two hours a day or sit for four was unsupported by the "mild objective findings" (Tr. 49 *citing* 40). She noted that Dr. Garg's conservative treatment of Plaintiff's back pain was also consistent with "basically normal" clinical findings (Tr. 40).   She also rejected Dr. Garg's finding that all postural activity would be precluded by noting that it was not supported by the record as a whole (Tr. 49).   She cited December, 2009 emergency treating observations that Plaintiff exhibited a normal gait, station, and range of knee motion and February, 2010 notes showing similar findings (Tr. 46, 49).   The ALJ noted that in partial deference to Dr. Garg's findings, the RFC restricted Plaintiff to work allowing both sitting or standing positions and limited postural activity (Tr. 49).

Further, the ALJ did not err in rejecting as "purely speculative" Dr. Garg's finding that Plaintiff would be required to miss more than three days of work each month (Tr. 49). First, none of Dr. Garg's records indicate that he had insight into Plaintiff's prospective rate of absenteeism. Second, as discussed below, substantial evidence generously supports the ALJ's conclusion that Plaintiff was capable of full-time work within the parameters of the RFC. Notably, Dr. Garg did not opine that Plaintiff was disabled from all work but instead, capable of working in low stress positions where he would be allowed to take breaks (Tr. 1281).

Plaintiff also argues that the ALJ erred by rejecting Dr. Alviar's September, 2009 consultative opinion on the sole basis that it contradicted later records. *Plaintiff's Brief* at 12. Contrary to this argument, the ALJ concurred with most of Dr. Alviar's findings of exertional and postural limitations (Tr. 50-51). However, she accorded "reduced weight" to Dr. Alviar's conclusion that Plaintiff was only capable of working a few hours a day (Tr. 50-51). In support of that finding, she noted that the examiner's conclusion was somewhat undermined by Plaintiff's use of opiates (Tr. 50). Further, later records showing minimal lower extremity limitations (see discussion at Tr. 46) support the ALJ's finding that Dr. Alviar did not have benefit of "a significant amount" of the subsequent evidence (Tr. 50). Moreover, because Dr. Alviar was an examining rather than treating source, his opinion was "entitled to no special degree of deference." *Barker v. Shalala,* 40 F.3d 789, 794 (6th Cir.1994) (citing *Atterberry v. Secretary of Health & Human Servs.,* 871 F.2d 567, 572 (6th Cir.1989)). As such, the ALJ was not required to explain her

reasons for its rejection.

Pursuant to SSR 96-8p, Plaintiff also argues that the ALJ failed to explain her rationale for including some of the alleged limitations in the RFC and excluding others. *Plaintiff's Brief* at 12-13. He asserts that the ALJ's statement that the RFC was "supported by the medical evidence of record, the credible medical opinions, the claimant's activities, and the other factors described above" (Tr. 52) was inadequate. *Id.* However, in making this argument, Plaintiff fails to note that the above quote was taken from the concluding sentence of the ALJ's *nine-page* discussion of medical records, testimony, and other evidence supporting the RFC (Tr. 43-52).

### B.   The Credibility Determination

Plaintiff also disputes the ALJ's finding that his claims were not wholly credible. *Plaintiff's Brief* at 13-16. He contends that the ALJ erred by citing his conservative treatment history, substance abuse, range of activities, and use of tobacco in support of the credibility determination. *Id.*

The credibility determination, guided by SSR 96-7p, describes a two-step process for evaluating symptoms. "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment. . .that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 1996 WL 374186, *2. The second prong of SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the testimony must be evaluated "based

on a consideration of the entire case record."*Id.* [5]

The deference accorded an ALJ's credibility determination is appropriate here. *See Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 531 (6th Cir.1997)(because "an ALJ is charged with the duty of observing a witness's demeanor and credibility," the "findings based on the credibility of the applicant are to be accorded great weight"). Plaintiff disputes the ALJ's reference to his "recent" substance abuse, noting that he has not used alcohol or illicit drugs since filing the application for SSI.   *Plaintiff's Brief* at 15. However, hospital records created well after the May, 2009 application state that he engaged in drug seeking behavior: he requested Dilaudid (December, 2009)(Tr. 1182); "persistently negotiat[ed] to get Dilaudid for pain (January, 2010)(Tr. 1187); and attempted to procure, but was denied Vicodin (February, 2010)(Tr. 1131).   Thus, the ALJ did not err in finding the presence of recent substance abuse.

---

[5]In addition to an analysis of the medical evidence, C.F.R. 404.1529(c)(3) lists the factors to be considered in making a credibility determination:

  (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

Likewise, the ALJ did not err in noting that injuries sustained while using a hammer, clearing trees, and moving furniture stood at odds with the alleged inability to perform light work (Tr. 48).   While Plaintiff notes that these activities occurred prior to the alleged onset date, Dr. Oliver-Brannon's   consultative notes state that as of September, 2009,   he was able to perform household chores, go to church, "cook a proper meal," and attend to his personal needs (Tr. 48, 1086).

Plaintiff also faults the ALJ for citing his continued use of tobacco in support of her credibility determination. *Plaintiff's Brief* at 15. He cites *Shramek v. Apfel*, 226 F.3d 809 (7th Cir. 2000) for the proposition that because smoking is unrelated to his heart condition, it should have not been used to discount his credibility.   *Plaintiff's Brief* at 15.   However, in contrast to *Shramek* in which the smoking cessation would not have improved the claimant's condition, present Plaintiff continued to smoke despite allegations that shortness of breath created severe functional limitations (Tr. 71, 80).   Moreover, the Sixth Circuit has held that smoking may be used to discount a claimant's allegations of disability.   *See Sias v. Secretary of Health and Human Services,* 861 F.2d 475, 480 (6th Cir. 1988)(" we can take judicial notice of the massive body of medical opinion . . . on the subject of cigarette smoking"); *Brown v. Social Security Administration*   2000 WL 876567, *1 (6th Cir. August 22, 2000)(claimant's continued smoking despite a diagnosis of chronic obstructive pulmonary disease "indicates that the condition is not disabling"). Plaintiff also argues that his allegations of disability were improperly dismissed because of the lack of objective medical evidence.   *Plaintiff's Brief* at 15 (citing SSR 97-6p, *supra).*

–22–

However, ALJ Warner did not rely exclusively on the lack of medical evidence to discount the claims, but instead cited Plaintiff's activities, smoking, and drug-seeking behavior to discount the claim.

In support of the credibility determination, the ALJ also noted that Plaintiff's "extensive evidence of an addiction to pain medications makes it difficult to determine to what extent [his] treatment visits were prompted by symptoms of his impairments, as opposed to attempt to obtain narcotics" (Tr. 48).   The records created during the relevant period strongly support the later inference (Tr. 675, 684, 690,778, 785, 806 , 817, 823, 1075).

Because the ALJ's credibility determination was well supported and explained, remand is not warranted.

### C.  Evidence Submitted After the Administrative Decision

Plaintiff has not based his arguments for remand on records submitted for Appeals Council review subsequent to the administrative decision (Tr. 1284-1307).   However, the Court, as is customary, reviewed the record for possible grounds for a "Sentence Six" remand under § 405(g).   These records indicate that Plaintiff was working as a cook/chef at least as early as August 2012.   The Court notes with concern that although this case was filed in January, 2013, neither the Complaint nor his present motion state that Plaintiff has resumed work.   Nor has Plaintiff amended the request for ongoing benefits to benefits for a "closed period."   The question of whether Plaintiff continues to work while alleging ongoing disability is particularly critical, given that he has already acknowledged that he

–23–

did not report his former cash earnings as a cook prior to filing the SSI claim (Tr. 68).

Nonetheless, the newer evidence suggesting that Plaintiff is seeking an award of benefits while gainfully employed did not play a role in my determination that the record before the ALJ amply supported her determination that Plaintiff was not disabled. Accordingly, I recommend that the ALJ's determination, well within the "zone of choice" accorded the administrative fact-finder, remain undisturbed. *Mullen v. Bowen*, *supra*.

### CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.   The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: February 12, 2014,              s/R. Steven Whalen
                                       R. STEVEN WHALEN
                                       UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the foregoing document was sent to parties of record on February 12, 2014, electronically and/or by U.S. mail.

                                       s/Michael Williams
                                       Case Manager for the
                                       Honorable R. Steven Whalen